## PETER BERRY ET AL. v. L. F. WATSON ET AL.

ERROR TO THE COURT OF COMMON PLEAS OF WARREN COUNTY.

Argued May 3, 1888—Decided October 8, 1888.

1. If, in an ejectment, the question be one of boundary by the lines of an original survey, and the plaintiffs have adduced evidence of the existence of a well marked line on the ground, in a place corresponding fairly with the return of survey, bearing the proper age, and with living corners of the timber called for, a prima facie case of location according to such line has been established.

2. The presumption that a return was made with reference to such location is not conclusive, but puts him who denies the applicability of such line to the land in controversy upon a showing of the facts and circumstances by which the presumption is to be rebutted, the evidence thereof to be submitted to the jury under proper directions.

3. Wherefore, it is error, in the instructions to the jury, after such evi-

dence, to overlook the presumption arising from the correspondence of the work on the ground with the returns of survey and the connection of the line claimed with other lines of the block, and to submit the question of the true location upon the evidence afforded by the calls and measurements only.

Before GORDON, C. J., PAXSON, STERRETT, GREEN, CLARK and WILLIAMS, JJ.; TRUNKEY, J., absent.

No. 62 January Term 1887, Sup. Ct.; court below, No. 48 September Term 1883, C. P. Forest county; No. 47 June Term 1886, C. P. Warren county.

On July 11, 1883, an action of ejectment was begun by Peter Berry, J. M. Clapp, W. T. Scheide, J. L. Grandin and E. B. Grandin against L. F. Watson, John S. Davis, Michael Murphy and John Galey, to recover 25 acres and 80.6 perches of land in Howe township, Forest county. The plea was, not guilty.

At a trial on December 16, 1884, there was a verdict in favor of the plaintiffs. Subsequently a new trial was granted. On March 18, 1886, a change of venue was ordered to Warren county. On July 3, 1886, a second trial resulted in a verdict for the plaintiffs. Afterwards, a new trial was granted.

At a third trial on February 7, 1887, the plaintiffs showed title to tract 4821, lying immediately south of tract 4792, upon the dark plan below, and claimed the land in dispute to be within the west line of their tract. The defendants showed title to tract 3133, lying immediately south of tract 3142 on the same plan, and claimed the disputed land to be within the east line of their tract.

At the foot of the north and south line between 4792 and 3142, there is a chestnut. This chestnut has upon it three marks, one facing north, another east and another west, and it is called, in the case, the easterly chestnut. At a distance of about 19.3 rods nearly west of the foregoing tree, stands another chestnut which has four marks upon it, one pointing a little east of north, a second a little south of east, a third a little west of south and a fourth a little north of west. This chestnut was called in the case the westerly chestnut. The plaintiffs contended that the westerly chestnut was the northwest corner of their tract 4821, from which corner, their

south line was run: the defendants contended that tract 4821 was bounded by a west line run south from the easterly chest-

nut.   The question submitted to the jury was, where was the west line of tract 4821 located on the ground by the original survey?

The warrants for a large number of tracts, including those referred to, were issued in the spring of 1794, and in September of the same year were located in one block by John Brodhead, the deputy surveyor.   The returns of 3133, 4821, 3142, 4792, all call for a common corner at a chestnut.   3142 calls for a white-oak at its southwest corner; for 3133 on the south, and for 4792 on the east.   4792 calls for 4821 on the south and 3142 on the west.

The method of accounting for the two marked chestnuts is illustrated by the plan shown on the following page: See Opinion of the Court.

Other facts appearing in the case are shown in the charge to the jury, CUMMIN, P. J., 29th judicial district, holding special term:

\*    \*    \*    \*    \*    \*    \*    \*

The plaintiffs in this case have shown title to the tract of

land known as 4821, shown upon the maps. They have shown title to no other land, and if they are entitled to your verdict

Charge of Court below.

in this case, it will be because they show to you that the land in controversy is a part of 4821; if it is not a part of 4821, no matter who owns it, these plaintiffs cannot recover. The defendants show title to tract 3133, which lies west of 4821, and. of course if this strip or piece of land in dispute belongs to 3133, then it does not belong to 4821, and your verdict must be for defendants. It is not necessary, however, in order that the verdict should be for defendants, that they should show title in them. If the plaintiffs do not show title in them to the land in dispute, then the verdict must be for the defendants.

\*    \*    \*    \*    \*    \*    \*    \*

[After general instructions as to the methods of executing warrants of survey issuing in early times from the land office, and the principles to be observed in finding the lines as they were established upon the ground, the court proceeded:]

The plaintiffs request the court to charge:

1. The survey of tract 4821, having been returned and accepted without caveat more than 80 years ago, is conclusively presumed to have been made upon the ground.

Answer: This point is affirmed.

2. The lines run and marked upon the ground by the surveyor constitute the actual survey, and wherever the calls of the surveyor's return differ from the work upon the ground, the calls must be disregarded.

Answer: This point is also affirmed.

3. There being undisputed lines upon the ground, to the north and west of tract 4821, answering to the return of survey in respect to age and courses, and no other line being found upon the same sides of the tract to which the return can be referred, the return will be presumed to have been made with reference to such lines.

Answer: This point is refused; it involves a question which it will be your duty to determine.[7]

The defendants request the court to charge [inter alia]:

3. The eastern chestnut, being the undisputed southwest corner of warrant number 4792, and southeast corner of warrant number 3142, is the northwest corner of warrant number 4821 and the northeast corner of warrant number 3133, called for in the official returns of survey of the latter tracts, and must there-

fore be adopted as the boundary of the plaintiffs' warrant in the absence of evidence of work actually done upon the ground by the surveyors in locating number 4821 and 3133, differing from and contradicting his return.

Answer: This point is affirmed. If there is nothing upon the ground to contradict the statement, it would be true.

4. There is no evidence that the line upon the ground, claimed by the plaintiffs as the division line between warrants number 4821 and 3133, was made by the surveyor as the division line between the said warrants, number 4821 and 3133.

Answer: This point is also affirmed.[2]

In considering this case, you have not only the testimony of the numerous surveyors as to what they found on the ground, but you have their opinions as experts, speaking from their knowledge of surveying and from the facts which they found. You have, also, the maps that have been given in evidence by the parties respectively, and you have the original returns of surveys of all the tracts surrounding this disputed land. And you have the certified connected maps.

\*    \*    \*    \*    \*    \*    \*    \*

The defendants in this case have in their possession this land in dispute. The plaintiffs claim they are entitled to the possession of it, and have shown you the title to tract 4821, and they claim that this disputed land is within the lines of that tract. If they have satisfied you of this fact, they are then entitled to your verdict. If they have failed to do so your verdict must be for defendants. The land in dispute is a piece or strip of land along the western line of 4821. The trouble that you are called upon now to investigate probably arose in the last century, and it came out substantially under the following circumstances:

In 1792, a number of persons who are known as the Holland Land Company obtained a large number of warrants, which entitled them to many thousand acres of land. In 1794 George Mead obtained a large number of warrants for lands belonging to the commonwealth. Although the Holland Land warrants were issued in 1792, no survey was made in pursuance of the warrants until the fall of 1794, as it would appear by the returns. In the meantime, these Mead warrants, which were issued early in 1794, were run upon the ground in April of

that year by deputy surveyor Williams; and they were run upon diagonal lines or 45 degree lines. The Holland warrants were run upon the ground on north and south lines by the successor of Williams, the deputy surveyor, John Brodhead. In May, 1794, or at least before the Holland Land Company warrants were surveyed, as it appears by the returns, they filed a caveat against Mead taking up the lands which he had surveyed, claiming that as their warrants were older they had a better right there, and this created a contest in the land office. This contest remained pending until the spring of 1796, and then it was amicably adjusted by the parties, the Holland Land Company, or those representing them on the one side, and Mead or those representing him on the other side; and a certain line was agreed upon to be the line between the two claimants in the land, and all of the Mead warrants that were northeast of that line were abandoned, except I think part of the tract 5282, and the Holland Land warrants that were south of that line were to be abandoned. And thus that controversy was settled by the agreement of the parties establishing this compromise line, which is spoken of as the Mead base line.

The Holland Land Company warrants were laid out on meridian lines, north, south, east and west, and by the parties agreeing to the Mead base line as the line of separation, which was a diagonal line to the other warrants. Wherever the Holland Land Company tracts came to this diagonal line, then different shaped tracts were formed. In some instances they were small triangles, and in other instances they contained more than four lines. It is the location of one of these small triangular pieces adjoining the Mead base line that causes the trouble that you are called upon to settle. Tract 3133, is, as you see, a small triangular tract fitting in at that point. So much of it as comes to 4821, is the piece I call your attention to. The land in dispute, as marked on the map, is represented by the broad red mark on the west side of 4821 on the defendants' map, and of course the same can be produced on the other maps. On the northeast corner of this disputed land is a chestnut tree of 1794, called the easterly chestnut. On the northwest corner of this disputed land is a chestnut tree, claimed by the plaintiffs to be of 1794, and called the westerly chestnut. The plaintiffs claim that the westerly chestnut or the line running

south from near it, is the western line of their tract, 4821. The defendants claim that the easterly chestnut and the line to run south from it, is the true western line of 4821. Your decision of this question will determine this case. If you find that the north and south line near the westerly chestnut, is the westerly line of tract 4821, then the plaintiffs are entitled to your verdict. And this is the question in this case which you are to decide.

Now, gentlemen, you will take the return of survey of 4821 and look for marks and lines made or adopted for that tract by the surveyor who made and returned it.

The plaintiffs claim the westerly chestnut or the line near it is the western boundary, because as they say, there is no other line found on the ground that may be used for such a purpose; because as they claim, it bears proper date; the line runs in the proper direction and it preserves the shape of the tract; and the plaintiffs say that the eastern chestnut is not the true corner; that it was marked for the tracts north of it; that it is only marked on three sides, and that it is not marked on the south side, from whence the defendants claim this line should run, and where there is no line to be found on the ground.

On the other hand, the defendants claim that the westerly chestnut and the line near it is not the true westerly line of 4821. As to that chestnut, they say it never was marked as a corner with three notches; that it does not stand on any line; that it is not at the intersection of any lines; that it is not as near the line nor as near the intersection of lines as many other large trees, and that it has no witness to it; that a witness near it points away from it and not towards it; that it was marked in the fall of 1793 or spring of 1794, before this tract, 4821, was surveyed; that it does not belong to the Holland Land Company warrants, of which 4821 is one; that it is not marked on the north, south, east and west, but at other points of the compass, nearly northeast and southwest, and northwest and southeast. They claim for these reasons that this tree should not be regarded in establishing that western line. On the other hand, they claim that the easterly chestnut is the true corner of tract 4821, and the line to run south from it would be the true western line. They claim this, because as they say the tree is in the right place; that it is the proper distance from fixed cor-

Charge of Court below.

ners to the east of it and to the west of it; that it is the identical tree called for in the return of the survey of this tract, and the others about it; that a line drawn from the south preserves the shape of the tract 4821; that the length of lines more nearly corresponds with the original surveys; that it better answers all of the calls; that it is a common corner of four tracts, and thus corresponds with the block of surveys to which it belongs, which is fixed by the returns of surveys. And for these reasons they claim that the eastern chestnut is the true line. And there may be other reasons presented by counsel on both sides that I have not called your attention to, which I do not now recall. These are substantially the claims of the parties, plaintiff and defendant, and the reasons why they claim the easterly chestnut is the western boundary, and why they claim the westerly chestnut is the western boundary. If you can determine this case by marks and lines on the ground, made and run for this tract of land, or adopted by the surveyor who returned the survey for this tract, it will be your duty to do so.

In this investigation you must remember the following important dates: The Mead lands, as appears by the returns of surveys, were surveyed in April, 1794. The Holland Land Company lands, as appears by the return of surveys, were made in September, 1794. One in April and the other in September of the same year. The compromise line, now called the Mead base line, was established in April, 1796, two years later. The Mead lands, April, 1794; Holland lands, September, 1794, and the compromise line in April, 1796. Again, you will recall the facts that the Holland Land Company's lands were laid out on north, south, east and west lines. The Mead lands were laid on 45 degree lines, diagonal lines to the Holland Land Company tracts. The compromise line is a 45 degree line, diagonal to the Holland Land Company lines. This compromise line of 1796 affected some of the lines of some of the Mead tracts, and some of the lines of some of the Holland Land Company tracts, and made triangular and irregular shaped tracts on the Holland Land Company's side of the line. No witness has testified to any marks made in 1796, when this compromise line was established. Generally, the evidence is that all the marks were made in the spring or

summer of 1794; that they include the growth of the year 1794; while the returns of the surveys of the Holland Land Company's lands declare that they were surveyed in September of that year and the compromise was not established until two years afterwards.

Consider all the evidence in the case, and from it alone determine whether you can find the true western line of tract 4821. If you can do so, it will be your duty to return your verdict in accordance with such finding. [If you can determine this question by marks and lines on the ground, made or adopted for this tract, that is the highest and best evidence of its true location, and must prevail. If you cannot otherwise determine the question submitted to you, and are compelled to look to the calls alone, it will not be a difficult question for you to solve. It seems to me, if this question is to be determined alone by the calls as found in the returns of survey, and the certified connected drafts, you will find that the northwestern corner of 4821 is the common corner of the four tracts, 3142, 4792 and 3133 and 4821. And if you so find, your verdict will be for the defendants.] [6] . . . . .

The verdict of the jury was in favor of the defendants. A rule for a new trial being refused, the plaintiffs took this writ, and assigned for error, inter alia:

2. The answer to the defendants' fourth point.[2]
6. The part of the charge embraced in [ ] [6]
7. The answer to the plaintiffs' third point.[7]

*Mr. C. Heydrick* and *Mr. John H. Orvis* (with them *Mr. Charles W. Stone, Mr. R. Brown, Mr. S. P. Johnson, Mr. W. M. Lindsey, Mr. James O. Parmlee* and *Mr. F. B. Guthrie*), for the plaintiffs in error:

Confronted by the well marked line of 1794, confessedly run by Brodhead south from the west chestnut, and connected with and really forming part of the line on which stands the admitted white-oak corner of 3142 and 3133; by the corner marks on that chestnut bearing the proper age; by the fact that that corner and the line running south from it are as nearly at the proper distances from the white-oak corner and Tionesta creek as could be expected from the general inac-

curacy of measurements in that locality.; and by the returns, corresponding to the work on the ground with remarkable fidelity, the learned judge declared in answer to the defendants' third and fourth points that there was no evidence that that line was made by the surveyor as the division line between warrants 4821 and 3133, and that the eastern chestnut, not marked as a corner of the tracts south of it, must be adopted as the boundary of plaintiffs' warrant.

1. We conceive this ruling to be in conflict with well settled rules of the law. In Lilly v. Kitzmiller, 1 Y. 28, it was declared that the courses and distances run upon the ground, or, as is said in later cases, the lines actually marked upon the ground, constitute the true survey. This doctrine has been applied in cases in which the lines, from their antiquity, seem to have been regarded as proving themselves, somewhat like ancient deeds and public records: Riddlesburg I. & C. Co. v. Rogers, 65 Pa. 416. That case is badly reported, but it is clear that the survey in question was more than seventy years old at the time of the trial, and that the lines upon the ground differed materially from those returned ; they seem to have had no other vouchers than their intrinsic evidence of originality.

2. Side by side with this doctrine another has grown up in Pennsylvania with respect to surveys. It was announced tentatively in Lambourn v. Hartswick, 13 S. & R. 121, that when a survey has been returned, and a time analogous to the statute of limitations has run around without caveat being filed, it ought to be presumed that it had in fact been made. The doctrine gathered strength as it was repeated with more confidence in its soundness, in Mock v. Astley, 13 S. & R. 382 ; Caul v. Spring, 2 W. 390 ; Nieman v. Ward, 1 W. & S. 68 ; until it was declared by STRONG, J., in Ormsby v. Ihmsen, 34 Pa. 462, that " the presumption which attends a survey returned without objection for more than twenty-one years, is more than a mere probability; it is presumptio juris et de jure, a legal conclusion " that it was in fact made ; and by GORDON, J., in Packer v. Schrader M. & M. Co., 97 Pa. 379, that " this presumption is one which no fact, however obvious, can rebut." Wherefore, if a line be found upon the ground answering to the return of survey " with reasonable certainty " in respect to age, course and distance from a known corner

such as the white-oak, one mile west of its north end, and from a large stream, such as the Tionesta creek, a few rods from its southern end, shall it not be accepted as determining the location of plaintiffs' claim on that side, all his other boundaries being free from doubt?

*Mr. C. H. Noyes* and *Mr. M. F. Elliott* (with them *Mr. L. R. Freeman* and *Mr. D. I. Ball*), for the defendants in error:

1. We do not dispute the two doctrines from which the plaintiffs think a presumption ought to be drawn to save their case. The lines run upon the ground by the surveyor for the purpose of bounding a tract, are undoubtedly the boundaries, though he may make a mistake in returning them. But it does not follow that lines made for any other than that specific purpose can have any effect. If they do have, it is because the return adopts them. So it is not disputed that a survey accepted without caveat for twenty-one years is conclusively presumed to have been run upon the ground. But where? If actually marked on the ground, the presumption has no place; and if not so marked, must it not be presumed to have been located as returned—i. e., by the calls, courses and distances, precisely as a survey is located, which was once marked on the ground, but whose marks have now disappeared? Surely it is not meant to assert that the presumption can attach a survey to a line shown to have been made for other purposes, and which the return shows was not adopted by the surveyor. The presumption is raised merely to quiet titles, and not to affect the location of tracts: Salmon Cr. L. & M. Co. v. Dusenbury, 110 Pa. 446 (1 Cent. R. 573).

2. There can be no question that the irregular tracts were all chamber surveys. All the surveyors practically conceded it, and the plaintiffs cannot argue their case without substantially admitting it. If so, it follows that the line, which the plaintiffs claim, was not marked for these tracts on the ground. The case was free from any material dispute as to the facts. The witnesses differed only as to the western chestnut, and whether the line ran to it; but all agreed that the line was on the ground, and intersected, or was intended to intersect, the east and west line somewhere. There was absolutely no dispute beyond this, except as to the legal inferences which

the surveyors on each side drew from the same undisputed facts. We thought and still think that the case should have been withdrawn from the jury. The scintilla doctrine was long ago exploded: Pleasants v. Faut, 22 Wall. 116; Hyatt v. Johnston, 91 Pa. 196; Howard Express Co v. Wile, 64 Pa. 201. We regard this case as ruled by Darrah v. Bryant, 56 Pa. 69.

OPINION, MR. JUSTICE WILLIAMS:

The plaintiffs are the owners of warrant No. 4821. The defendants have title to No. 3133. Both tracts were surveyed for the Holland Land Company, and are a part of a large block of surveys made for that company by John Brodhead, deputy surveyor. The question is one of boundary, and depends primarily on the lines of the block to which these surveys belong.

The warrants for the Holland Land Company were issued in January, 1794, came into the hands of Brodhead in May of the same year, and were located on the ground soon after, in a single block. The district line and the sub-district line parallel with and ten miles west of it, were adopted as the eastern and western boundaries of the block. The land intermediate between these lines was appropriated by running east from the sub-district line five miles, the length of five tracts, then turning south the breadth of two tracts, and then returning west to the sub-district line inclosing ten tracts; then going south the breadth of two tracts, and again turning east five miles, south across two tracts and west to the sub-district line, inclosing another interior block of ten tracts, and so on as he went south. In like manner the surveyor ran west from the district line five miles, north the breadth of two tracts, then returning to the district line inclosed ten tracts; and so on as he went north along the district line.

No. 3133 is the northeastern tract of an interior block resting on the sub-district line. No. 4821 is the northwestern tract of the opposite interior block resting on the district line. They adjoin, and in the returns of survey each calls for the other as an adjoiner. But the north line of the interior block to which 3133 originally belonged turns south at a chestnut corner. This corner is on the ground, and marked as a corner

on four sides. The north line of the block to which 4821 belongs, turns north at a chestnut corner. This is also found upon the ground marked on the east, west and north, and an original line extending north from it. The latter of these chestnut corners is about twenty rods east of the other, and about three rods further north. It is quite evident that the surveyor, failing to find the chestnut he had first marked, when he ran out his distance going west from the district line, marked another on three sides so as to make it a common corner of the tracts north of the east and west line, and then turned north.

The strip of land having the eastern chestnut as its northeast corner, and the western chestnut as its northwest corner, and extending south along the line which runs south from the western chestnut, is the subject of this controversy.

If the question depended simply upon the lines of the Brodhead survey, it would be easy of solution. The footmarks of the surveyor are readily followed. The western chestnut, marked as a corner for the tracts on the south, with an original line extending south from it, would fix the northeast corner and the east line of 3133 beyond question. But in February, 1794, one hundred warrants for one thousand acres each, were issued to George Mead, warrantee. These warrants were put in the hands of Williams, then deputy surveyor of the district, and he proceeded to locate them in a large block, with lines of forty-five degrees. In May, 1794, Wilson, the agent of the Holland Land Company, filed a caveat against the acceptance of these surveys, and at about the same time Williams ceased to be deputy surveyor, and John Brodhead was appointed in his place. The warrants of the Holland Company were then put in the hands of Brodhead who proceeded to locate them in the manner already described. In making his surveys he paid no attention to the work done by his predecessor in the location of the Mead warrants, but overlapped it many thousand acres. In April, 1796, the proceedings upon the caveat ended in a compromise, by the terms of which the caveat was withdrawn as to all the Mead warrants except twenty-six, and as to these Mead relinquished all claim to the land covered by them. These warrants lay along the northeastern edge of the interference, and Mead's withdrawal of claim under them

and the withdrawal of the caveat by Wilson left the remainder of each block in compact form with a forty-five degree line as the boundary between them. This line cut diagonally through many of the Brodhead surveys, leaving a part of each to fall within the lines of the Mead warrants and an irregularly shaped part remaining on the Holland Company's side of the division line. These fragments of surveys were after the compromise combined by Brodhead in such manner as to inclose, as nearly as practicable, the amount of land in each tract that the warrant authorized, and the body of surveys was then returned in October, 1796, as having been made in 1794, the time when the work relating to this block was actually done upon the ground.

The theory of the plaintiffs was, that in making the combination of fragments of surveys Brodhead had adhered to his original lines as run and marked in 1794, and that 3133 was therefore bounded on the east by the marked line running south from the western chestnut. The theory of the defendants was that in covering the irregular serrated strips between the boundary line and the unbroken parallelograms of the Holland Company's block, Brodhead had found it necessary to depart from the original lines in several places, including the division line now in controversy, and had adopted for the northeast corner of 3133, as plotted by him, the southwest corner of 4792. Whether this was so or not was the controlling question in the case; but the defendants went further in their points, and asked the court to instruct the jury as follows: " 4. There is no evidence that the line upon the ground claimed by the plaintiffs as the division line between warrants Nos. 4821 and 3133 was made by the surveyor as the division between the said warrants."

This point was affirmed without comment or explanation. The jury was bound by this instruction, and we do not see that anything was left for their determination that was necessary to a verdict. The plaintiffs must show that the land claimed was within their warrant or they could not recover. If when their case closed there was no evidence to show that the line claimed by them as their western boundary was run as such, then clearly they had not inclosed the land in controversy, and were not entitled to a verdict for it. Nor can this answer be sustained

on the assumption that the compromise line had made a change in the number of the warrants as well as in their outlines, or contour.

The line was run to separate the tracts lying on its opposite sides. They had no numbers at that time, and if they had, a change of them subsequently would be immaterial. The line was marked on the ground as a part of the work locating the interior block to which No. 3133 belonged, and what the deputy surveyor might do in plotting lines not so marked, or in giving a name or a number to the tracts at any time before returning his survey, could have no effect upon the lines which he had actually run and marked. When the compromise line was adopted so many of the Holland Company's tracts or parts of tracts with the lines peculiar to them as fell below it, were by the terms of the compromise relinquished or abandoned to Mead and his surveys. So many of the tracts or parts of tracts with the lines peculiar to them as remained above that boundary, were unaffected by it, except that such tracts as were cut through lost so much of their territory and lines as fell below that line. Both 3133 and 4821 were cut through by the compromise line and lost part of their original territory and lines thereby. A change in shape on that side of each became necessary in order to conform to the Mead line, and a combination of the remnants of two or more original tracts in order to secure for each warrant a sufficient quantity of land.

The plaintiffs claimed that except as to the new lines made necessary by the change in form of these warrants, they were to be located by the lines of 1794, and treated as part of the block of the Brodhead surveys. The defendants, on the other hand, contended that the tracts between the Mead line and the unbroken tracts of the Holland Land Company, were plotted into the irregular space along the Mead line after the compromise had been effected in 1796, and that in so doing the original work on the ground had been followed or disregarded as convenience in the division of the space had made it desirable. As to the common corner of 3133 and 4821, at the north end of the division line, they contended that both chestnuts bore the proper age, and that the calls for adjoiners in the original returns of survey showed that the eastern chestnut had been adopted by the deputy surveyor.

The question for the court and jury was whether there was such evidence of the adoption of the eastern chestnut as to overcome the presumption arising from the line on the ground running south from the western chestnut. If there was not, then the plaintiffs were entitled to recover. But the fourth point and its affirmance by the court took this question out of the case, for the jury was told that there was no evidence that the line depended on by the plaintiffs was ever run as the division line between the warrants. If this was so, there being no other line on the ground, then the plaintiffs had failed to close their survey or to inclose in any manner the land in controversy. It was of no consequence therefore whether the defendant's theory as to the adoption of the eastern chestnut was correct or not, since the line relied on by the plaintiffs was found to be wholly unsupported by the evidence and could not sustain a verdict in their favor. But this answer overlooks what seems to us strong and pertinent evidence tending to show that the line on the ground was run by the surveyor as the division line between these surveys.

The white-oak in the angle of the north line of 3133 was conceded to be an original corner of the survey. An original line ran east from it to the western chestnut and ended there. The chestnut was marked as a corner on four sides, and from its south side an original line ran to and far into the Mead lands. These facts together with the connection between this work and the other lines of the Brodhead block, and the correspondence of the work on the ground with the returns of the deputy surveyor, should have gone to the jury instead of being in effect withdrawn from them, and they should have been left at liberty to find from this evidence that the line on the ground was run and marked as the division line between these tracts, and was the line by which the rights of the parties were now to be settled. It is true the court refused in answer to the 5th and 6th. points to take the case from the jury, and submitted to them the question as to which of these chestnuts was the true northeast corner of 3133; but what was there left from which the jury could determine this question? The original line having been discredited and taken from them, there remained only the calls for adjoiners and the measurements of the east and west lines from which the question of the adoption of one of these chest-

nuts as the common corner of the warrants could be determined. This the learned judge saw, and in directing their attention to this part of the testimony expressed his own opinion of its force in a way that must have been controlling with them. He said, " it seems to me if this question is to be determined by the calls alone as found in the returns of survey and the certified connected drafts, you will find that the northwestern corner of 4821 is the common corner of the four tracts, 3142, 4792, 3133, and 4821, and if you so find your verdict will be for the defendants.

The plaintiffs have substantial grounds for complaining of this mode of submitting their case to the jury. It overlooked the presumption arising from the fact that the work on the ground corresponded with the return of survey in age, and with the other lines of the block of which these warrants were part. It withdrew the western chestnut and the line south from it from the attention of the jury by the instruction that there was no evidence to show that it was run for the line of these warrants. It submitted the question of the true location of the common corner upon the evidence afforded by the calls and the measurements, and it gave the jury the benefit of the opinion of the court, that from this evidence they would conclude that the eastern chestnut was the true northeast corner of 3133. How much was left of their case when the jury retired to consider their verdict, it is not easy to see.

The second and sixth assignments of error are sustained. The seventh must also be sustained. The presumption to which it relates is not conclusive, but it is certainly prima facie, and the proof of the existence of a well marked line on the ground in a place corresponding fairly with the return of survey and bearing the proper age, with living corners of the timber called for, makes a case of location in the first instance, and puts him who denies the applicability of such a line to the land in controversy upon a showing of the facts and circumstances by which the presumption is to be rebutted. The rebutting evidence is under proper directions to be submitted to the jury, but the presumption stands until it is fairly overcome.

We take pleasure in commending the clearness and completeness with which this case is presented to us in the paper

Syllabus.

books of the learned counsel for the respective parties. Some of the facts upon which the questions were raised are novel and interesting, and they have been illustrated by maps and diagrams, and explained by the printed and oral arguments in a, manner that has been greatly helpful.

It is to be regretted that this protracted litigation could not. have ended with the trial in the court below, but we see no escape from the necessity of sending it back for a new trial.

Judgment reversed, and venire facias de novo, awarded.